IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**CEDRIC OLLISON**,

        Plaintiff,

   v.

**JOHN VARGO**,

        Defendant.

Case No. 6:11-cv-01193-SI

**OPINION AND ORDER**

Eryn Karpinski Hoerster, Garvey Schubert Barer, 121 S.W. Morrison Street, Eleventh Floor, Portland, OR 97204. Attorney for Plaintiff.

Ellen F. Rosenblum, Attorney General, Andrew D. Hallman, Assistant Attorney General, Oregon Department of Justice, 1162 Court Street N.E., Salem, OR 97301. Attorneys for Defendant.

**Michael H. Simon, District Judge.**

      Plaintiff Cedric Ollison ("Ollison" or "Plaintiff") is a 50-year-old male inmate in the custody of the Oregon Department of Corrections ("ODOC"). He is housed at the Oregon State Penitentiary ("OSP"). On the morning of March 29, 2011, Ollison reported to sick call. Pl.'s Comp., Dkt. 2 at 5. More than 12 hours later, he was transported to a hospital where he was diagnosed with a stroke. *Id.* Plaintiff alleges that Defendant Dr. John Vargo ("Dr. Vargo"), the chief medical officer of the OSP, was deliberately indifferent to Ollison's serious medical need

PAGE 1 – OPINION AND ORDER

by failing to send Ollison to the hospital despite the fact that Ollison exhibited multiple stroke symptoms, including slurred speech, lack of balance, and focal neurological deficits. *Id.* at 4-5.

Ollison brings this suit under 42 U.S.C. § 1983, alleging that Dr. Vargo violated Ollison's Eighth Amendment rights under the United States Constitution by failing to treat Ollison's stroke. Dr. Vargo now moves for summary judgment. Dkt. 74. For the reasons that follow, the Court denies Dr. Vargo's motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient. . . . " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND[1]

On March 29, 2011, Ollison woke up in his cell at OSP with a nosebleed and a severe headache. When he got out of bed, he noticed that his balance was off, his vision was blurred, and he was dizzy. Despite Ollison's history of untreated hypertension,[2] this was the first time that he had experienced such serious symptoms.

When his cell door was opened at 6:00 a.m. for breakfast, Ollison went to the nurse station on the main floor control center and reported his symptoms. He asked the nurses for a pass to Health Services, but the nurse told Ollison to wait in his cell until the Health Services staff arrived for the day. Ollison returned to his housing unit. Having trouble maintaining his balance, Ollison leaned up against a cell block wall for support. At this point, Anthony Link ("Link"), a friend and fellow inmate, approached Ollison to ask what was wrong. After hearing Ollison's description of his symptoms, Link went to the main floor control center and told a sergeant that Ollison needed to be seen by medical personal in Health Services. Link then helped Ollison walk from the main floor up to Health Services, before Link left for his work assignment.

Ollison arrived at Health Services before 7:00 a.m., where he was assisted by an inmate orderly, Keith Ward ("Ward"). Ward helped Ollison into a chair in the waiting room to await the arrival of a nurse who could examine him. After a short period of time, Nurse Patrick Henkelman ("Henkelman") arrived and examined Ollison in the waiting room. Henkelman reviewed Ollison's charts and saw the earlier diagnosis of hypertension and Ollison's history of refusing

---

[1] The following facts are based on the record viewed in the light most favorable to Ollison, the non-moving party.

[2] Ollison was first incarcerated at OSP in 1996. He was placed on blood pressure medication in 2000, and subsequently released from custody. When Ollison returned to OSP in 2009, he refused blood pressure medication. The record indicates that he did not take any blood pressure medication, or discuss his high blood pressure with any OSP medical staff, between 2009 and 2011. Shelton Dec. ¶ 9, Ollison Dep. at 23:3-6.

PAGE 3 – OPINION AND ORDER

medication. Henkelman then took Ollison's vital signs—all of which were within normal limits except for Ollison's blood pressure, which was extremely high. Based on Ollison's high blood pressure, reported symptoms, and medical history, Henkelman decided to do a neurological examination on Ollison. Henkelman performed the neurological examination because he believed there was a possibility that Ollison was suffering from a stroke. Henkelman Dep. at 32:23-25. Henkelman further stated that performing a neurological examination on a patient with extremely high blood pressure was required by the Oregon Department of Correction's ("ODOC") Health Services protocol as well as consistent with his training as a licensed nurse. Henkelman Decl. ¶ 14. Despite the fact that Ollison passed the neurological test, Henkelman decided that Ollison's blood pressure was so high that he should stay in Health Services to be examined by a doctor.

Ollison remained in the waiting area of Health Services until Dr. Vargo arrived sometime between 8:30 a.m. and 9:30 a.m. *See* Ward. Decl. ¶ 3. During the time that Ollison was waiting, Heckelman took Ollison's blood pressure frequently. *Id.* When Dr. Vargo finally arrived and saw Ollison sitting in the waiting area, Dr. Vargo asked Ollison what was wrong and directed Ward to assist Ollison to a couch in the infirmary. *Id.* Despite the fact that more than two hours had passed since Henkelman's examination of Ollison, Dr. Vargo did not take Ollison's blood pressure or perform a neurological examination, as was required by ODOC protocol. Vargo Dep. at 72:17-73:24. Dr. Vargo stated at deposition that his progress notes, which recorded that Ollison was having trouble with his balance and had elevated blood pressure, were merely a recitation of the information Henkelman had passed along several hours earlier. *Id.* at 72:17-73:24.

PAGE 4 – OPINION AND ORDER

When Dr. Vargo prescribed anti-hypertension medication to Ollison at 10:15 a.m., Dr. Vargo asked Ollison to walk to the pharmacy window so that Dr. Vargo could administer the medication. Ollison Dep. at 53:20-55:22. Ollison protested, because of his blurred vision and dizziness, but was able to walk to the pharmacy window unassisted. While standing at the pharmacy window, however, Ollison fell to the floor in front of Dr. Vargo. *Id.* Dr. Vargo asked Ward to help Ollison off the floor and back to the infirmary while Dr. Vargo held the door. *Id.* at 55:12-57:12; Ward Decl. ¶ 4.

Ollison remained on the couch in the infirmary for several hours without being formally admitted. Ollison Decl. ¶ 9. Dr. Vargo neither checked up on Ollison later in the afternoon nor ordered a nurse to conduct any formal monitoring or periodic vital or neurological checks. *See* Husk Dep. at 36:25-37:22. ODOC's policy on suspected strokes, which Dr. Vargo knew of and approved, requires that providers "assess neurological status as much as possible . . . ." Vargo Decl. ¶ 6 and Att. 1; Vargo Dep. at 153:14-155:22. If a patient begins to exhibit focal neurological symptoms, it is critical to transport the patient to a hospital: "If evaluation reveals that a stroke is likely to be occurring, time is critical! TPA (clot buster) is shown to have the best efficacy if given within three hours of the initial onset of the neurologic deficit." Vargo Decl. ¶¶ 6, 8 and Att. 1; Vargo Dep. at 153:14-155:22; *see also* Shelton Decl. ¶¶ 33-36; Bozorgchami Decl. ¶¶ 5-7. Nurse Catrina Husk ("Husk"), a nurse on duty at Health Services on March 29, 2011, testified that although doctors sometimes order a nurse to conduct formal and regular monitoring for patients with high blood pressure, no such order was given by Dr. Vargo for

Ollison.[3] Husk Dep. at 37:6-22; *see also* Hoerster Decl., Exs. 6, 8 (Progress Notes and Physician's Orders).

At some point between 10:15 a.m. and 2:00 p.m., Ollison began to exhibit focal neurological signs, suggesting that he might be suffering from a stroke.[4] The signs were first observed by Ollison's friend and fellow inmate Jerome Akles ("Akles"), who visited Ollison in the infirmary. Akles immediately realized that Ollison was in trouble and wanted to contact Ollison's family to inform them of his lack of treatment. Akles Decl. ¶¶ 4-6. Akles stated that when he visited Ollison, he was "literally falling into the walls, and when he tried to speak to me his speech was slurred and nearly incoherent." *Id.* at ¶ 4. Akles left the infirmary to find someone who could contact Ollison's family. *Id.* at ¶ 6.

Akles returned to general population and found a friend to call Ollison's sister Sonja Arigbon ("Arigbon"). When Arigbon heard of Ollison's condition, she immediately started making phone calls to OSP in an attempt to check up on her brother. Arigbon Decl. ¶¶ 3-4. Arigbon began calling OSP a little after 12:45 p.m., and was finally able to speak to her brother when an officer in the infirmary handed Ollison the officer's cell phone. *Id.* at ¶ 4. Arigbon noticed that Ollison's speech was incoherent, and she knew that something must be seriously

---

[3] Ollison's expert witness, Dr. Hormozd Bozorgchami, states: "Generally, patients who have extremely high blood pressure are at great risk for [an ischemic] stroke. Therefore, the apparent lack of monitoring of Mr. Ollison's condition posed a substantial risk to Mr. Ollison's health." Bozorgchami Decl. ¶ 6.

[4] Dr. Bozorgchami notes: "When Mr. Ollison arrived for medical treatment at Oregon State Penitentiary with blurred vision, dizziness and a headache, he hadn't necessarily suffered a stroke. He may have been suffering from hypertensive encephalopathy, which also causes these symptoms. An ischemic stroke is often distinguished by focal neurological deficits, which include weakness on one side of the body, slurred speech, arm drift, and facial weakness. It appears that Patrick Henkelman performed a neurological examination of Mr. Ollison at 7:00 a.m., and that Mr. Ollison was not presenting with acute focal neurological deficits at that time. Therefore, there is evidence that Mr. Ollison had likely not yet suffered an acute or subacute ischemic stroke." Bozorgchami Decl. ¶ 4.

PAGE 6 – OPINION AND ORDER

wrong. *Id.* at ¶ 5. Arigbon tried calling various numbers at OSP, but was unable to get any staff to respond to her concerns about her brother's medical condition. *Id.* at ¶ 6.

At around 2:00 p.m., upon reporting for her shift, Husk performed a head-to-toe examination of Ollison as part of the standard infirmary admissions process.[5] Ollison was the first patient that Husk examined during her shift, and she performed the head-to-toe assessment shortly after starting her shift. Husk Dep. at 26:25-27:18. Husk observed that Ollison was exhibiting neurological deficits—weakness on one side of his body and slurred speech. *Id.* at 25:16-25:22. Husk stated: "I looked at the vitals and I looked at the assessment, and I thought, it's time to call a doctor." *Id.* Husk testified that she called Dr. Vargo immediately after her initial assessment. *Id.* at 25:11-13. Ollison argues that Husk's testimony reasonably suggests that Husk notified Dr. Vargo of Ollison's neurological deficits at this point in time, a little after 2:00 p.m. Ollison also argues that the "Physician's Orders" record made at 2:30 p.m., which notes a doctor's order for stronger blood pressure medication, indicates that Dr. Vargo was aware of Ollison's worsened state, and rather than send Ollison to the hospital, Dr. Vargo simply ordered stronger medication.[6]

At approximately 4:00 p.m., Dr. Vargo left OSP for the day. Uribe Decl. ¶ 18. When Dr. Vargo left, he did so without providing any orders for Ollison's care or his transport to a hospital. At approximately 5:30 p.m. or 5:45 p.m., two nurses, Kathleen Walker ("Walker") and

---

[5] There is conflicting evidence as to whether Husk came on duty at 2:00 p.m. or 3:00 p.m., *see* Uribe Decl. ¶ 17; Husk Dep. at 58:17-59:14; Henkelman Decl. ¶ 9, however, for the purposes of summary judgment, Dr. Vargo's counsel agreed that the Court may conclude that Husk came on duty at 2:00 p.m.

[6] Dr. Vargo asserts that he was notified about Ollison's deficits to his left arm and left-side weakness at around 5:00 p.m. Vargo Decl. at ¶ 14-16. Dr. Vargo claims that he recalls Husk calling him and that Dr. Vargo then ordered that Ollison be transferred to the hospital. Vargo Decl. ¶ 14. Husk recorded in the progress notes an order regarding transferring Ollison to the hospital at 5:00 p.m. Hoerster Decl., Ex. 6 (Progress Notes)

PAGE 7 – OPINION AND ORDER

Danita Uribe ("Uribe"), heard from Husk that Ollison was having a stroke.[7] Walker and Uribe immediately notified Dr. Ole Hansen—the doctor on duty in Health Services—that Ollison might be having a stroke. Uribe Decl. ¶¶ 18, 20; Walker Decl. ¶ 8. According to Uribe, Dr. Hansen very quickly recognized Ollison's stroke symptoms and ordered a transport to a hospital emergency room. Uribe Decl. ¶ 21. Uribe and Walker worked together to help facilitate Ollison's transfer to the hospital. Walker Decl. ¶ 8; Uribe Decl. ¶¶ 9, 21.[8]

The parties agree that Ollison left OSP for the emergency room at 6:13 p.m. and arrived at Santiam Memorial Hospital at 6:44 p.m. At the hospital, Ollison was treated by Dr. Robert L. Jacques, who reported:

> Obvious left facial weakness of significance [and] . . . evidence of significant weakness involving the left upper extremity with 1-2/5 and with wrist drop. Lower extremity demonstrated a 2-3/5 muscle strength assessment as opposed to 5/5 of both the right upper and lower extremities assessment.

Hoester Decl., Ex. 11 at 1 (Santiam Memorial Hospital Emergency Department Report).

Dr. Jacques did not administer IV tPA (Tissue Plasminogen Activator) treatment, which can be

---

[7] Ollison offers evidence that Dr. Vargo communicated to Husk that he did not want to send Ollison to the hospital for emergency treatment. Walker remembers Husk stating that Ollison's blood pressure had been high all day but that Dr. Vargo did not want to send Ollison to the emergency room. Walker Decl. ¶ 7. Walker further stated that at one point Husk walked out of the infirmary and told both Walker and Uribe that Ollison was "having a stroke." Uribe Decl. ¶ 16; Walker Decl. ¶ 8. Walker was shocked at this news and responded, "Oh My Fucking God, why aren't you doing anything?" Walker Decl. ¶ 18. According to Walker, Husk responded that since Ollison had already suffered from the stroke, there was nothing more that could be done. *Id.* Uribe's statements also indicate that Dr. Vargo had decided not to send Ollison to a hospital. Uribe stated: "Nurse Husk said to us something to the effect of 'I think Ollison is having a stroke.' She also informed us that Dr. Vargo had ordered medication for [Ollison]." Uribe Decl. ¶ 16. Defendant challenges several of Walker's statements as inadmissible hearsay. As discussed below, the Court did not consider this evidence for the purposes of the summary judgment analysis.

[8] Dr. Hansen does not remember the incident clearly, but testified: "I have some vague recollection of a nurse talking to me about a patient in the back and whether he should be sent out, but that's all I can remember." Hoerster Decl., Ex. 5 (Hansen Dep.) at 8:1-11.

PAGE 8 – OPINION AND ORDER

administered within three hours of an ischemic stroke, because he did not know when Ollison started exhibiting focal neurological deficits. *See* Shelton Decl. ¶¶ 36-37; Bozorgchami Decl. ¶ 11; Hoerster Decl., Ex. 13. Dr. Jacques eventually transferred Ollison to Salem Hospital at approximately 11:00 p.m. so that Ollison could be treated by a neurologist. Dr. William Seeto and Dr. Yasutake Fuke treated Ollison at Salem Hospital. Dr. Seeto noted, "at this point it is clearly outside of the window for tissue plasminogen activator or other aggressive interventional therapy." Hoerster Decl., Ex. 12 (OSP Stroke Protocol) at 2.

Ollison returned to OSP on the evening of March 31, 2011 and was housed in the infirmary until June 7, 2011. Ollison Decl. ¶¶ 12-13. The stroke caused Ollison to have left side paralysis, which he still suffers from today. Ollison alleges that since his stroke, he has also experienced severe depression and anxiety.

## DISCUSSION

### A. Deliberate Indifference to a Serious Medical Need

Dr. Vargo argues that he is entitled to summary judgment because Ollison cannot prove the requisite mental state of Dr. Vargo necessary to bring a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care. Specifically, Dr. Vargo argues that Ollison cannot establish that Dr. Vargo acted with a culpable state of mind—that Dr. Vargo was deliberately indifferent. Dr. Vargo initially also argued that Ollison cannot prove that Dr. Vargo's actions caused harm to Ollison, however, Dr. Vargo withdrew this argument in his reply brief (Dkt. 111). Ollison responds that there is sufficient evidence in the record to allow a jury to conclude that Dr. Vargo was deliberately indifferent to Ollison's serious medical need.

#### 1. Legal Standards

The government has an obligation "to provide medical care to those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to serious

PAGE 9 – OPINION AND ORDER

medical needs constitutes unnecessary and wanton infliction of pain, which is proscribed by the Eighth Amendment. *Id.* at 104. In this context, however, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. In order to state a claim relating to medical care under § 1983, a prisoner must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* Allegations that a medical professional was negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.*

To establish an Eighth Amendment violation under § 1983, a prisoner must satisfy "both the objective and subjective components of a two-part test." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)). First, the plaintiff must show "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). Second, he must demonstrate that the prison official "acted with deliberate indifference in doing so." *Toguchi*, 391 F.3d at 1057 (citation and quotation marks omitted). Under this standard, for example, a medical decision declining to order an x-ray ordinarily does not represent cruel and unusual punishment but is a matter for medical judgment. *Estelle*, 429 U.S. at 107.

Deliberate indifference may be shown "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Jett,* 439 F.3d at 1096 (citation and quotation marks omitted). A "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1970). Therefore, a

defendant is liable if he knows that a plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. For example, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

There are at least two district courts within the Ninth Circuit that have addressed the issue of deliberate indifference in the context of an inmate stroke. In *Chaparro v. Lohmann*, 2007 WL 4335484 (D. Ariz. Dec. 7, 2007), an inmate brought suit under § 1983 asserting that a nurse and doctor had been deliberately indifferent when they waited 12 hours to transport the inmate to the hospital after he complained of dizziness and nausea and presented with swelling and tenderness at the base of his skull from a fall that occurred two days earlier. *Id.* at *4. The doctor prescribed a pain killer, anti-nausea medication, and a soft neck brace for support. *Id.* at *1. Additionally, the nurse kept the inmate in the Central Detention Unit for close observation. *Id.* When the inmate complained of vomiting late in the evening, he was transferred to the medical center and it was determined that he had suffered a stroke two days earlier. *Id.* He was then airlifted to a hospital for treatment. *Id.* At summary judgment, the plaintiff conceded that the recitation of facts by the defendant was accurate. *Id.* The court granted summary judgment for the defendants because based on the course of treatment and the fact that the defendants were monitoring the inmate throughout the day, there was no evidence of deliberate indifference. *Id.* at *4. The court found that the most the plaintiff could prove was medical negligence. *Id.*

In *Gray v. Dage*, 2013 WL 1415844 (E.D. Cal. April 8, 2013), an inmate alleged that he complained to a doctor multiple times throughout the day of dizziness, numbness on one side of

PAGE 11 – OPINION AND ORDER

his body, and slurred speech. *Id.* at *1. The doctor accused the plaintiff of faking the symptoms. *Id.* After 12 hours, the inmate was transported to the hospital where it he was diagnosed as having suffered a stroke. *Id.* The court found that there was an issue of fact as to "whether defendant responded to plaintiff's objectively serious medical needs with a sufficiently culpable state of mind." *Id.* at *7 (quoting *Farmer*, 511 U.S. at 842-43 n.8 (knowledge of a substantial risk can be shown by the "fact that the risk was obvious" and the prison official can be held liable if "he merely refused to verify the underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist")). The court noted discrepancies between the defendant doctor's statements and the statements of one of the nurses and the plaintiff, finding "there is clearly a genuine dispute over what information was presented throughout the day to defendant regarding plaintiff's medical needs and risk of stroke." *Id.* at *7.

### 2. Genuine Dispute of Material Fact

In the present case, viewing the record in the light most favorable to the non-moving party, there are sufficient facts to allow a reasonable jury to conclude that Dr. Vargo acted with deliberate indifference. First, unlike the careful and continuous monitoring performed in *Chaparro*, Ollison was not monitored after Dr. Vargo performed his initial examination at around 9:30 a.m. Dr. Vargo's failure to perform a neurological examination, to order a neurological examination, or to order regular monitoring of Ollison could allow a jury to conclude that he was deliberately indifferent because Dr. Vargo disregarded the "serious risk" of stroke "by failing to take reasonable measures to abate it." *See Farmer*, 511 U.S. at 842.

At his deposition, Dr. Vargo stated that he was well aware of Ollison's history of untreated high blood pressure and that he was not surprised to hear that Ollison had a stroke: "I knew for a long time that eventually it was going to happen to him." Vargo Dep. at 93:7-12. The evidence, albeit disputed, may reasonably suggest that after Dr. Vargo examined Ollison at

PAGE 12 – OPINION AND ORDER

around 9:30 a.m., no medical provider checked Ollison's blood pressure or performed a neurological examination for almost five hours, until Husk examined Ollison when she came on shift at 2:00 p.m. Moreover, Akles and Arigbon observed symptoms of a stroke sometime around 12:45 p.m. *See* Akles Decl. ¶ 4-6; Arigbon Decl. ¶ 5-6. This suggests that if there had been ongoing monitoring of Ollison, the medical staff may have observed signs of a stroke well before 2:00 p.m. and could have taken appropriate action earlier. Plaintiff's expert witness, Dr. Bozorgchami, opines that given the standard of care in Marion County, Oregon, and given Ollison's "extremely high blood pressure, history of untreated hypertension, and signs of hypertensive encephalopathy, it would be medically unacceptable for a treating physician to fail to monitor his medical condition, including the frequent monitoring for elevated blood pressure and neurological deficits." Bozorgchami Decl. ¶ 5. Dr. Bozorgchami also noted that Dr. Vargo's knowledge of Ollison's medical history underscores that Dr. Vargo was aware of the serious medical need. *Id.* This evidence demonstrates that at the very least, there are disputed issues of fact as to whether Dr. Vargo's failure to perform a neurological examination and to order ongoing monitoring of Ollison demonstrates deliberate indifference.

Second, there is evidence in the record to suggest that, unlike the doctor in *Chaparro* who sent the inmate to the hospital when his condition worsened, *see Chaparro*, 2007 WL 4335484 at*1, Dr. Vargo did not order Ollison be transferred to the hospital when Husk observed focal neurological deficits at around 2:00 p.m. Ollison has presented sufficient evidence so that a jury reasonably could infer that Dr. Vargo was notified by Husk of Ollison's stroke symptoms at around 2:00 p.m. and still did not order Ollison to be transferred to the hospital. Husk testified that she called Dr. Vargo as soon as she examined Ollison. Although the parties disagree about what happened next, a jury reasonably could infer from the fact that Ollison was not transferred

PAGE 13 – OPINION AND ORDER

to the hospital until 6:13 p.m., and the fact that there is a 2:30 p.m. doctor's order in the progress notes for stronger blood pressure medication, that Dr. Vargo did not order Ollison to be transferred despite signs of a stroke, and instead just ordered additional blood pressure medication. If Dr. Vargo did not transfer Ollison to the hospital when he knew he was having a stroke, a jury could reasonably conclude that Dr. Vargo was deliberately indifferent to a serious medical need. These facts, like the facts in *Gray*, are disputed by the Defendant. Because Ollison has presented evidence sufficient to create a genuine dispute of material fact, this case, like *Gray*, is not well suited for disposal on summary judgment. Therefore, viewing the evidence in the light most favorable to the non-moving party, a reasonable jury could conclude that Dr. Vargo was deliberately indifferent.

**B. Qualified Immunity**

Dr. Vargo argues that he is entitled to summary judgment based on qualified immunity. Under the doctrine of qualified immunity, government officials may be immune "from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A prisoner's right not to have his or her serious medical needs treated with deliberate indifference is a clearly established right. *McGuckin v. Smith*, 974 F.2d 1050, 1061-62 (9th Cir. 1992), *overruled on other grounds by WMX Tech., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). In fact, prisoners have had "a clearly established right not to have their serious medical needs treated with deliberate indifference since long before Dr. Vargo first treated [plaintiff]." *Actkinson v. Vargo*, 284 F. App'x 469, 472-73 (9th Cir. 2008) (unpublished) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1061-62 (9th Cir. 1992) (establishing that the clearly established right existed since 1992)). As discussed above, there are genuine issues of material fact as to whether Dr. Vargo deliberately disregarded Ollison's serious medical need. Thus, there

PAGE 14 – OPINION AND ORDER

are genuine issues of material fact as to whether Dr. Vargo violated Ollison's clearly established right. As such, summary judgment is not appropriate on qualified immunity grounds.

## C. Evidentiary Objections

Dr. Vargo objects to two pieces of evidence cited in Ollison's Response to the Motion for Summary Judgment. Dkt. 96. First, Dr. Vargo objects to Walker's declaration in which she asserts that Husk told Walker that Ollison "had high blood pressure and that Dr. Vargo didn't want to send [Ollison] to the ER," Walker Decl. ¶ 7. Dr. Vargo argues this statement is inadmissible hearsay. Second, Dr. Vargo objects to Ollison's assertion that "there is some evidence that Dr. Vargo may have a practice and custom of preventing OSP inmate patients from being transported to the emergency room when they had required emergency treatment." Pl. Opp. at 13, n.6, Dkt. 96. In making this assertion, Ollison cites to Ward's declaration, where he states, "Dr. Vargo's disregard for [Ollison's] conditions was not surprising to me because it was the way he always treated patients." Ward. Decl. ¶ 7. Ward goes on to explain how Dr. Vargo allegedly stopped the transfer to a hospital of another inmate who had reportedly swallowed razor blades. *Id.* Dr. Vargo insisted the inmate be placed in a solitary room instead, where the inmate later died. *Id.* Dr. Vargo argues that this evidence is irrelevant.

Ollison responds that Dr. Vargo's statements to Husk are admissible as party admissions, and that Huck's statements are not hearsay for two reasons: (1) because Husk was acting as Dr. Vargo's agent when she made the statements; and (2) because the statements are not offered for the truth of the matter asserted but instead to show Husk's motivation for not transferring Ollison to the hospital. Ollison argues that the evidence of Dr. Vargo's practice of refusing to authorize hospital transports for other inmates is admissible as evidence of Dr. Vargo's motive, intent, or lack of accident in deciding not to order Ollison's transport to the hospital. Fed. R. Evid. 404(b)(2).

PAGE 15 – OPINION AND ORDER

Based on the Court's analysis above, which does not consider these two pieces of evidence, there is sufficient evidence in the record to create a genuine dispute of material fact without the two items of evidence to which Defendant objects. The Court, therefore, defers ruling on these evidentiary objections until after they can be more fully briefed and argued in the parties' motions *in limine*.

## CONCLUSION

The Court **DENIES** Dr. Vargo's Motion for Summary Judgment (Dkt. 74).

**IT IS SO ORDERED**.

DATED this 18th day of March, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge